IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

CLAIRE G.[1],                                          No. 3:18-cv-00492-HZ

        Plaintiff,

   v.

NANCY A. BERRYHILL, Acting                    OPINION & ORDER
Commissioner of Social Security,

        Defendant.

James W. Moller
P.O. Box 1368
Wilsonville, Oregon 97070

     Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

Renata Gowie
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2936

Catherine Escobar
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

        Attorneys or Defendant

HERNANDEZ, District Judge:

Plaintiff Claire G. brings this action seeking judicial review of the Commissioner's final

decision to deny disability insurance benefits (DIB) and supplemental security income (SSI).

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. §

1383(c)(3)).  I reverse the Commissioner's decision and remand for additional proceedings.

## PROCEDURAL BACKGROUND

Plaintiff protectively filed applications for DIB and SSI on August 22, 2014, alleging an

onset date of July 22, 2013.  Tr. 179-80, 181-86.  Her applications were denied initially and on

reconsideration.  Tr. 54, 58-68 (DIB Initial); Tr. 55, 69-81 (SSI Initial); Tr. 112-16 (DIB & SSI

Initial); Tr. 82-95, 110, 122-24 (DIB Recon.); Tr. 96-109, 111, 125-47 (SSI Recon.).   On

December 21, 2016, Plaintiff appeared, with counsel, for a hearing before an Administrative Law

Judge (ALJ).  Tr. 33-53.  On February 23, 2017, the ALJ found Plaintiff not disabled.  Tr. 13-32.

The Appeals Council denied review.  Tr. 1-5.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on having depression, post-traumatic stress disorder

(PTSD), gender dysphoria, anxiety, obsessive compulsive disorder (OCD), and attention deficit disorder (ADD).  Tr. 218.  At the time of the hearing, she was thirty years old.  Tr. 37.  She is a high school graduate and has past work experience in a variety of part-time jobs but no relevant full-time work experience.  Tr. 37-39.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Disability claims are evaluated according to a five-step procedure.  *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability).  The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Yuckert*, 482 U.S. at 141;

20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can perform past relevant work, the claimant is not disabled.  If the claimant cannot perform past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her July 22, 2013 alleged onset date.  Tr. 18.  Next, at steps two and three, the ALJ determined that Plaintiff has severe impairments of gender dysphoria, a depressive disorder, and an anxiety disorder, but that the impairments did not meet or equal, either singly or in combination, a listed impairment.  Tr. 18-20.

At step four, the ALJ concluded that Plaintiff has the RFC to perform a full range of work at all exertional levels.  Tr. 20.  However, the ALJ concluded that Plaintiff has the following nonexertional limitations: she should have ready access to a restroom facility; she can perform entry-level work with a reasoning level not to exceed 2; she should have no interaction with the public; and she can have occasional interaction with coworkers and supervisors.  Tr. 20-25.  With

this RFC, the ALJ determined at step five[2] that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as janitor, hand packager, and small products assembler. Tr. 25-26. Thus, the ALJ determined that Plaintiff is not disabled. Tr. 27.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff contends the ALJ erred by (1) finding her subjective limitations testimony not credible; (2) rejecting the opinion of her treating therapist; and (3) finding the testimony of the

---

[2] Because Plaintiff has no past relevant full-time work, the ALJ moved directly to step five after determining the RFC. Tr. 25.

lay witness not credible.

I.  Claimant Credibility

The ALJ is responsible for determining credibility.  *See Vasquez*, 572 F.3d at 591.  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility:  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain.  *Id.*; *see also*

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*:

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation. For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.] While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.] Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ cited the proper two-step inquiry. Tr. 21. He noted Plaintiff's allegations that her ability to work is limited by clinical depression, PTSD, gender dysphoria, anxiety, OCD, and ADD. Tr. 21 (citing Tr. 218). He further noted her hearing testimony that she experiences stomach problems when stressed, she has difficulty interacting with the public, and she experiences nightmares that keep her awake. *Id.* But, the ALJ explained, while Plaintiff's medically determinable impairments could reasonably be expected to produce such symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these

symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* Thus, the ALJ found Plaintiff's statements "to affect [her] ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." *Id.*

The ALJ then addressed Plaintiff's gender dysphoria and noted that while she had been diagnosed with this impairment, she had taken steps to transition from male to female. Tr. 22. He observed that she had taken hormones and had surgery to change her appearance. *Id.* She had further surgery planned. *Id.*

Next, the ALJ found that the record showed little mental health treatment during the period at issue. *Id.* He noted records showing that in June 2014, she had not been seen for more than one year, and that she had additional appointments in December 2014, at which she reported she was not in counseling. *Id.* In July 2015, she had another appointment and was advised to seek therapy. *Id.* She began treatment with Charlotte Redway, LCSW in November 2015, seeing Redway eight times in thirteen months. *Id.*

The ALJ rejected Plaintiff's testimony about experiencing manic episodes for several reasons. Tr. 23. The diagnosis, by Redway, was not from an acceptable medical source and thus, under controlling regulations, could not be considered a valid medically determinable impairment. *Id.* Further, the record showed that the diagnosis was based on Plaintiff's self-reported history. *Id.* And, at that time, Plaintiff denied manic episodes. *Id.* At one point in July 2015 when Plaintiff reported that she cleans repeatedly and does not sleep much during periods of "extra energy," she acknowledged that some of that behavior could be the result of consuming energy drinks. *Id.*

Next, the ALJ noted that Plaintiff had been able to work in the past despite symptoms of anxiety, depression, and gender dysphoria. *Id.* (noting her ability to sustain a part-time job for three years out of high school). He also found that her history of never holding a part-time job "suggest[ed] a preference for part-time work rather than inability to work on a full-time basis." *Id.* Further, at one point, Plaintiff indicated that she was getting only four hours of work per week, "suggesting that she was able to work more." *Id.* She stopped working her most recent job at Safeway because of "constant mis-gendering and rude remarks by customers" and because she was given too few hours. *Id.*

The ALJ found that Plaintiff's activities were inconsistent with her allegations of debilitating mental impairments. *Id.* The ALJ noted that Plaintiff reported socializing with friends in the BDSM community, she maintained an open relationship with a partner for several years, she walked and biked for transportation, and she shopped, used public transportation, and attended appointments. *Id.*; *see also* Tr. 19 (noting that in regard to interacting with others, Plaintiff was able to shop independently and use public transportation as necessary despite reporting avoidance of public contact); Tr. 25 (noting that Plaintiff can leave the house to attend appointments and for such tasks as going to court to have her name changed). Finally, the ALJ found that her prior work activity as a grocery courtesy clerk and gas station attendant required significant public contact. Tr. 23.

Plaintiff argues that the ALJ's findings are not clear and convincing reasons supported by substantial evidence in the record. Specifically, Plaintiff argues that the ALJ erred by finding that Plaintiff's limited daily activities are inconsistent with her symptom reporting, by mis-representing her work history, and by "cherry picking" isolated records showing improvement in

her mental health.

A.  Activities of Daily Living

At the hearing, Plaintiff testified that she engages in social activity outside of her apartment only "when they can convince me to go out[.]" Tr. 46-47.  She and her partner go for walks and go to see her partner's family in Springfield.  *Id.*  Occasionally she sees her own family.  Tr. 47.  She testified that she spends a good amount of time sleeping, which she attributed to her depression.  Tr. 48.  She likes to work with electronics and puts together computers.  *Id.* She uses social media such as Facebook and participated in a transgender support group there, but she and another member "didn't quite see eye to eye, so that fell apart."  *Id.*

Previously, in a written Adult Function Report dated October 2014, Plaintiff reported that she cannot handle being around people without feeling trapped.  Tr. 241.  She avoids human interaction due to past verbal and physical abuse.  *Id.*  She has a lot of anxiety over being mis-gendered.  *Id.*  She reported that she was able to function better when she was younger but "the constantly being beaten down has worn me out." Tr. 242.  Sometimes she sleeps a lot and sometimes she stays up for days.  *Id.*  She can prepare meals but on a bad day, she prepares only soda and microwave popcorn.  Tr. 243.  She rarely goes outside and only when her partner makes her.  *Id.*  When she goes out, she walks or rides in a car.  Tr. 244.  She shops in stores for food, clothes, and computer parts.  *Id.*  She works with computers and plays video games.  Tr. 245. She spends time with her partner watching television or grocery shopping together.  *Id.*

In June 2015, Plaintiff reported that she had become more withdrawn and depressed and

will do whatever she can to avoid people. Tr. 258.[3] In an updated disability report filed in September 2015 after her initial applications were denied, she reported worsening depression, seclusion, and anxiety, made worse by rehashing old traumas in therapy sessions. Tr. 270. She also said that she was leaving the house less often. Tr. 275 ("Leaving the house is more rare as time goes by.").

The ALJ's characterization of Plaintiff's activities is not a fair reading of the record insofar as the ALJ used the activities to discount Plaintiff's testimony that she rarely leaves her home and has difficulty functioning outside of that environment. In support of his finding that Plaintiff socialized with the BDSM community, the ALJ cited to an April 2013 medical record by Suzanne Scopes, N.D. Tr. 23 (citing Ex. 5F/6). There, Dr. Scopes noted that Plaintiff was going out with friends and the new "BDSM community." Tr. 365. The problem, however, is that this report concerns a time period several months before Plaintiff's alleged onset date and thus, does not undermine her testimony that later, she rarely left her home.

Next, the ALJ found that Plaintiff maintained an "open relationship with a partner for several years." Tr. 23 (citing Ex 11F/12). The record, dated October 27, 2015, is within the alleged period of disability and does report Plaintiff's request for a sexually transmitted disease test because she was in an open relationship with her partner. Tr. 445. While it was reasonable for the ALJ to interpret this as suggesting Plaintiff may have had more then one sexual partner, the record provides no reasonable basis to conclude that this occurred for "several years" or that it occurred outside of Plaintiff's home.

---

[3] This exhibit bears no date and is written in the third person. Tr. 258. However, the Administrative Record Exhibit Index lists this as a form completed by Plaintiff on June 1, 2015 and I have treated it as such.

The ALJ also cited Plaintiff's report of walking and biking for transportation. Tr. 23 (citing Ex. 5F/14). The cited record is from Dr. Scopes who noted that Plaintiff biked or walked for all of her transportation. Tr. 373. But, like the other record from Dr. Scopes cited by the ALJ, this too is dated before the alleged onset date and thus, does not undermine testimony describing Plaintiff's symptoms after that date. *Id.* (chart note dated February 2012, more than one year before alleged onset date).

Finally, the ALJ cited that Plaintiff shops, uses public transportation, and attends appointments. Tr. 23. Although the ALJ did not include a cite to the record at this point in his discussion, earlier he cited to a January 2015 psychological evaluation performed by Marc Stuckey, Psy.D. Tr. 19 (citing Ex. 7F/1). There, Dr. Stuckey described Plaintiff's daily activities as avoiding the public for the most part given a lack of trust and having no routine social outlets but "will independently shop and use public transportation when necessary." Tr. 393. Without more, it is unclear how frequently "when necessary" suggests Plaintiff was able to engage in shopping and using public transportation. Furthermore, this report is dated January 8, 2015 which, while after Plaintiff's alleged onset date, is before reports made in June and September 2015 of worsening symptoms of isolation and rarely leaving her home. Additionally, the record shows that Plaintiff's partner accompanied her to many appointments. Tr. 400 (Jan. 2015 evaluation with Dr. Stuckey); Tr. 508 (eight appointments in 2015-2016 with Redway).

The ALJ also later cited to a court record reflecting Plaintiff's name change as evidence that she is able to leave the house. Tr. 25 (citing Ex. 4D). The court document cited by the ALJ shows that Plaintiff's name was officially changed on June 19, 2015. Tr. 187. There is no mention of any court dates, much less multiple court dates, and there is no indication from this

single record that any personal appearances, if there were any at all, were by Plaintiff alone or with her partner. In the briefing, Defendant cites to the record to argue that Plaintiff "attended multiple court dates, related to her name change." Def.'s Brief 12 (citing Tr. 406), ECF 14. The cited record is a May 26, 2015 medical record which makes no mention of a name change. Tr. 405-06. However, on a different page in the record, there is a June 17, 2015 medical chart note referring to two court dates. Tr. 404. Still, there is no indication that Plaintiff went to these by herself. Thus, without more, the court date record is not inconsistent with Plaintiff's testimony.

In summary as to Plaintiff's activities, the evidence in the record generally supports Plaintiff's testimony regarding her social isolation, leaving her home rarely, and usually leaving home only with her partner. The evidence relied on by the ALJ either pre-dated the alleged onset date, failed to actually show that she socializes and leaves her home more frequently than she testified, failed to acknowledge that when she leaves her home, it is usually only with her partner, or failed to account for testimony that her symptoms worsened in 2015. Thus, this finding is not supported by substantial evidence in the record.

B. Work History

As to her work history, the ALJ observed that Plaintiff was able to work in the past despite symptoms of anxiety, depression, and gender dysphoria. Tr. 23. He also reasoned that her history of only part-time work suggested a preference for part-time work rather than an inability to work full-time. *Id.* The ALJ further noted that she left her work for reasons other than her disability. *Id.* And, he found that the nature of some of her jobs undermined her testimony that she could not tolerate public contact. *Id.*

The ALJ's findings regarding Plaintiff's work history are not entirely supported in the

record.  Plaintiff, as the ALJ noted, worked part-time for three years out of high school.  Tr. 23; *see also* Tr. 227 (Work History Report).  Her work history shows that she worked a few months in 2010, a few months in 2011, and a few months in 2013.  Tr. 227.  Before that, she worked for a temporary job placement agency.  *Id.*; *see also* Tr. 193 (showing work at two temporary job placement agencies between 2006 and 2009).  She also worked during high school.  Tr. 227. That Plaintiff was able to work part-time, a few months of the year, for a few years, all before her alleged onset date, does not establish an inconsistency with her symptoms of anxiety, depression, and gender dysphoria.  Plaintiff herself testified that she functioned better when she was young and her mental health issues have worsened over time.  Moreover, a history of part-time work does not contradict assertions that her mental health issues affect her ability to work more than part-time.  Additionally, Plaintiff's "public contact" jobs of grocery store clerk and gas station attendant do not contradict her testimony of increased social isolation because she performed these jobs before her alleged onset date.

The ALJ also erred by concluding that Plaintiff's part-time work history showed a preference for part-time work and not an inability to work full-time.  The problem with this finding is that without more, the ALJ's reasoning would apply to any claimant who has worked only part-time regardless of the circumstances and context.  Such an interpretation is unreasonable.  Here, Plaintiff initially worked part-time while in high school.  Tr. 227.  That particular part-time job, performed while also going to school, does not show a preference for part-time work.  Then, Plaintiff worked other part-time jobs in the years after high school, all before her alleged onset date.  The ALJ himself noted that at one point, Plaintiff remarked that she was getting only four hours per week, which suggested to the ALJ that she was able to work

more.  Tr. 23.  This statement by the ALJ, indicating that Plaintiff wanted *more* work, contradicts the ALJ's own reasoning that her part-time work history shows she did not want more than part-time work.  Plaintiff then enlisted in the Marines in late 2010.  Tr. 192-93.[4]  Her enlistment undermines the ALJ's reasoning that she prefers part-time work.  I agree with Defendant that when the record allows for more than one reasonable interpretation, the Court must credit the ALJ's interpretation.  Def.'s Brief 11.  However, the record in this case does not allow the inference the ALJ made.  Although the part-time work history does not alone affirmatively establish that Plaintiff is unable to work full-time, it is not reasonable to rely on that work history to conclude that Plaintiff *prefers* part-time work.

Finally, in regard to her work history, the ALJ noted that Plaintiff left her jobs for reasons other than her alleged disabling symptoms.  Tr. 23 (citing Ex. 5E/3).  In the record cited by the ALJ, Plaintiff reported that she stopped working "[b]ecause of my condition[s]" and "[b]ecause of other reasons."  Tr. 219.  She explained that she was subjected to "[c]onstant mis-gendering and rude remarks by customers."  *Id.*  She also said that she was getting only four hours per week with sometimes zero hours per week, and was told that "they 'forgot' to put me on the schedule."  *Id.*  At the hearing, Plaintiff testified that she stopped working because she was let go by more than one employer, and her most recent job at Safeway was giving her only a few hours.  Tr. 37-38.  The record is not as clear as the ALJ suggests.  The ALJ neglected to note that more than one employer let Plaintiff go.  And, the ALJ neglected to note that at Safeway, where she left because she was getting so few hours, she was also subjected to rude comments related to her gender

---

[4]  She was discharged for medical reasons one week before completing boot camp.  Tr. 38.

identity issues.  Thus, while there is some evidence that she left Safeway for a reason unrelated to her impairments, the record is more nuanced than the ALJ's opinion indicates.

C.  Medical Record

In setting forth his credibility findings, the ALJ said that Plaintiff's subjective limitations testimony was "not entirely consistent with the medical evidence[.]" Tr. 21.  At this point in the opinion, the ALJ did not specify what particular medical evidence was inconsistent.  However, I assume from the discussion after this statement that he referred to the following: (1) the medical record showing the "steps" Plaintiff has taken in her transition from male to female, including hormone therapy, bilateral scrotal orchiectomy, and bilateral breast augmentation; (2) a lack of evidence supporting a PTSD diagnosis; (3) records showing "little mental health treatment during the period at issue"; (4) records showing normal mood and affect; and (4) lack of evidence supporting a bipolar disorder diagnosis.  Tr. 22-23.

Plaintiff does not appear to challenge the findings that the record does not support the PTSD or bipolar disorder diagnoses.  *See* Tr. 41 (statement from counsel at the hearing that the psychological examiner referred to a "nightmare disorder . . . which . . . it's not PTSD[.]").  I do not address these findings further.

The ALJ's opinion regarding Plaintiff's gender dysphoria is best understood in the context of his questioning at the hearing.  He asked: "Now I saw, you mentioned the gender dysphoria, and I think - - that should've been taken care of, right?"  Tr. 40.  Plaintiff responded: "It's an ongoing thing."  *Id.*  The ALJ asked Plaintiff "why," given that Plaintiff is "now female," had surgery, and changed her name, "is it an ongoing problem?"  *Id.*  Plaintiff told the ALJ that her sex reassignment surgery was still not done and she was "still hoping to speak with my therapist

further." *Id.* The ALJ persisted by suggesting that "as far as the mental issues, you've reconciled with yourself as being female, right?" *Id.* Plaintiff responded that all of the steps had not yet been taken. *Id.* The ALJ then said that he understood that "there are physical issues," and he dismissed those as having a significant impact on Plaintiff's ability to work. Tr. 40-41. He was interested in the "mental health issues that would be associated with it[.]" Tr. 41. Plaintiff told the ALJ that she has a problem interacting with the public. *Id.* She also still suffers from nightmares from having been bullied for quite a few years. *Id.*

It is apparent from this exchange that the ALJ dismissed Plaintiff's subjective limitations testimony regarding the continuing mental health effects of gender dysphoria because Plaintiff took significant medical steps in her transition. But, the evidence in the record indicates that despite the medical procedures, Plaintiff still experienced mental health disturbances in the form of anxiety and depression related to her gender identity issues. For example, in his January 2015 report, Dr. Stuckey noted that Plaintiff had been in distress for several years as a result of transitioning to female, even while taking hormones which she began in 2011. Tr. 400 (Dr. Stuckey report); Tr. 356 (chart note indicating starting taken estrogen in 2011). Since her surgeries in September 2015 and May 2016, she continues to carry a gender dysphoria diagnosis. *E.g.*, Tr. 492, 500 (Nov. 30, 2016 chart notes stating that Plaintiff was seeking care regarding gender dysphoria and then confirming that diagnosis); Tr. 502 (Dec. 13, 2016 list of diagnoses by Redway including gender dysphoria); Tr. 508 (Dec. 15, 2016 memo from Redway noting that while Plaintiff had made significant medical steps to be more comfortable in her female body and that each step "seems to alleviate the depression and anxiety caused by gender dysphoria," the extent of her childhood trauma nonetheless left her in a state of anxiety and depression). The ALJ

himself found it to be a serious impairment.  Given Plaintiff's testimony and the medical

evidence in the record, the ALJ erred by concluding that Plaintiff's medical procedures

eliminated any ongoing mental health limitations attributable to gender dysphoria.

The ALJ remarked that Plaintiff had had little mental health treatment.  Tr. 22.  He noted

that after not being seen for over one year, Plaintiff reported to Dr. Scopes in June 2014 that she

was experiencing stress related to legal issues and having her computer stolen.  *Id.*  She reported

increased depression in December 2014.  *Id.* But, Plaintiff noted that she was not in counseling at

that time.  *Id.* (citing Ex. 10F/7).  In July 2015, Plaintiff reported symptoms of depression and

anxiety that were primarily related to gender dysphoria and she was advised to seek therapy.  *Id.*

She began treatment with Redway in November 2015 and had seen her eight times through the

date of the ALJ hearing.  *Id.*

The record shows that Plaintiff received assessment and treatment for psychological and

behavior issues starting at age five.  Tr. 294-300 (autism assessment in 1993 at age six); Tr. 301-

07 (educational assessment in 1998 at age eleven, noting dysphoria and social alienation); Tr.

308-54 (treatment records from The Children's Program from 1992 to 2005 and again from 2006

to 2009, ages five to twenty-three).  In 2014, Plaintiff's primary treatment provider at The

Children's Program wrote a treatment summary noting that beginning in 1990 and continuing

until 2009, Plaintiff had been seen for a variety of issues and received treatment over the years

for tics, some obsessive behaviors, irritable bowel syndrome, social difficulties, depression, and

gender identity.  Tr. 309.  Part of Plaintiff's treatment included several antidepressant

medications.  *Id.*  In 2009, Plaintiff's care was transferred to a new therapist with expertise in

gender identity issues.  *Id.*; *see also* Tr. 315 (chart note from Allan Cordova, Ph.D. at The

Children's Clinic noting Plaintiff's long-term history as a client at the clinic and Plaintiff's then-discomfort with continuing to attend a clinic, at age twenty-three, that sees many children).

Plaintiff starting seeing Dr. Scopes in July 2010. Tr. 378. In February 2012, Dr. Scopes remarked that Plaintiff had not made any calls to therapists yet. Tr. 373. She had started taking hormones about six months before but had not yet experienced changes to her depression. *Id.* The plan was to call therapists and try some support groups. *Id.* In April 2012, Plaintiff was still not in counseling, though she remarked that her depression was improving. Tr. 372. Dr. Scopes provided her with the name and phone number of a low-cost counseling agency. *Id.* In May 2012, Plaintiff reported that she was still too nervous to go to the Q Center and had not followed up on counseling. Tr. 370. She had joined a Facebook support group, however. *Id.* In August 2012, Dr. Scopes provided more counseling referrals because Plaintiff had still not followed up on the previous one. Tr. 368.

At an April 2013 visit, there is no mention of counseling. Tr. 365. Then, in June 2014, Plaintiff reported a bad mood for the last few months but indicated it was stress related. Tr. 362. Her depression was causing her to be more lethargic and she found it hard to leave the house. *Id.* Dr. Scopes noted that Plaintiff was still dealing with depression, despite having been on hormones for almost three years. *Id.* She referred her to a particular foundation for financial assistance. *Id.*

A chart note from Mary Gabrielle at the Southlane Medical Clinic dated August 8, 2014 notes that Plaintiff was "working on Directions and Center for Family Development for counseling." Tr. 357. She remarked that Plaintiff was positive for depression and suicidal ideation but that she had no suicide plan. *Id.* She noted that Plaintiff was nervous and anxious

and was "seeking counseling."  *Id.*

Dr. Scopes noted in December 2014 that Plaintiff now was on the Oregon Health Plan (OHP).  Tr. 433.  According to the chart note, Plaintiff remarked that her depression was up and down and manifests in not leaving the house and sleeping a lot.  *Id.*  The plan was for Plaintiff to call about low cost counseling referrals or check into what the OHP covered.  *Id.*

A May 2015 chart note states that Plaintiff's insurance changed, prompting her to leave the care of Dr. Scopes and establish care with Legacy Medical Group.  Tr. 406.  Dr. Ben Ly, M.D., reported her to be positive for suicidal ideas, hallucinations, self-injury, dysphoric mood, decreased concentration, and agitation.  Tr. 407.  She appeared nervous and anxious.  *Id.*  Incongruently, the same record states that she had a normal mood and affect, that her behavior was normal, and that her judgment and thought content were normal.  *Id.*  Dr. Ly referred Plaintiff to a psychiatric mental health nurse practitioner (PMHNP) to support her desire for gender-affirming surgeries and to further manage her bipolar disorder symptoms.  Tr. 405.

Plaintiff saw PMHNP Jennifer Combs in late May 2015 and again in late June 2015.  Tr. 420, 422.  In a July 2015 follow-up appointment, Combs noted Plaintiff's persistent depressive disorder and OCD as current problems with symptoms of low motivation, negative thinking, checking behaviors, and ruminating thoughts.  Tr. 458.  Although Plaintiff was negative for suicidal ideation, homicidal ideation, and psychotic processes, she reported her mood as depressed and anxious.  Tr. 460.  Combs remarked that Plaintiff seemed to have a significant amount of depression and anxiety that were presently uncontrolled.  Tr. 459.  She believed Plaintiff would benefit from treatment with a mental health practitioner.  *Id.*  Combs further noted that Plaintiff had seen Reid Vanderberg for counseling and gender therapy for a few years

before starting her hormone replacement therapy.  *Id.*

In August 2015, Dr. Lishana Shaffer at Oregon Health & Sciences University noted that Plaintiff was positive for depression and memory loss.  Tr. 472.  She appeared as nervous and anxious.  *Id.*  But, a few months later, in October 2015, a chart note from Dr. Ly noted that she had a normal mood and affect, normal behavior and judgment, and normal thought content.  Tr. 446.

In August 2016, Dr. Ly again noted that Plaintiff had normal mood, affect, judgment, behavior, and thought content.  Tr. 439.  In November 2016, Dr. Shaffer remarked that Plaintiff had a bright affect without neurovegetative signs of depression and that her judgment and insight were intact.  Tr. 494.  Plaintiff reported that she had eliminated energy drinks from her diet, but had replaced them with coffee.  Tr. 492.  Dr. Shaffer advised her to stop drinking caffeine after 3:00 p.m. to help with her sleep, but she said she was unable to do this.  *Id.*

Finally, Plaintiff began mental health counseling with licensed clinical social worker Charlotte Redway in November 2015.  Tr. 501.  Redway saw her, with her partner, monthly or as needed.  *Id.*  She diagnosed her with severe anxiety, PTSD, gender dysphoria, and bipolar disorder.  Tr. 502.  During her treatment, which by December 2016 had consisted of eight sessions but was still ongoing, Redway had discussed Plaintiff's acute anxiety, issues related to transphobia, OCD and bipolar symptoms which impact Plaintiff's ability to leave her home, and more.  Tr. 508.

The record shows that Plaintiff was in mental health treatment continuously until about age twenty-three when she left The Children's Program in 2009.  Combs's chart note indicates that she continued to receive mental health counseling from Vanderberg for a couple of years

before starting her hormone replacement therapy in 2011, suggesting that her mental health treatment was fairly continuous until sometime in 2011.

The ALJ's indication that her treatment was sporadic after that time is a fair reading of the record, at least until June 2015 when she began to see Combs, followed by her initiating treatment with Redway in November 2015. But, it is unclear whether Plaintiff had the funds to pay for counseling. The record has repeated references to the need for low-cost counseling options. Dr. Scopes referred her to a foundation for financial assistance. Although Plaintiff qualified for the OHP at one point, it is unclear what, if any, counseling resources the OHP covered. Another record states Plaintiff relied on her parents for financial support. Tr. 365 ("[p]arents helping out with expenses").

Gaps in medical treatment can support an adverse credibility determination but not if the failure to obtain treatment is due to the claimant's lack of funds or another "good reason[]." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007); *see also* Soc. Sec. Ruling (SSR) 16-3p (available at 2016 WL 1119029, at *8-9) (Commissioner will not find an individual's symptoms inconsistent with a lack of treatment without considering possible reasons, including the inability to pay for treatment). Even though the record suggests that financial inability may have prevented Plaintiff from seeking ongoing mental health treatment, the ALJ here failed to explore why Plaintiff had only sporadic mental health treatment from 2011 to 2015, and in particular from her July 22, 2013 alleged onset date to her initiation of therapy with Redway in November 2015. This was error.

The ALJ cited a May 2015 chart note from Dr. Ly to support his observation that the record showed Plaintiff had normal mood and affect. Tr. 22 (citing Ex. 8F). The ALJ did not

note that Dr. Ly's record also reported her as being positive for suicidal ideas, hallucinations, self-injury, dysphoric mood, decreased concentration, and agitation.  Tr. 407.  Thus, this record is ambiguous and confusing.  But, Dr. Ly did at other times make the same finding regarding her normal mood and affect.  Tr. 446 (Oct. 2015); Tr. 439 (Aug. 2016).  And, the ALJ correctly noted that Dr. Shaffer's November 2016 exam revealed a "bright affect without neurovegetative signs of depression." Tr. 494.  Thus, the ALJ accurately observed that there some medical records which are inconsistent with Plaintiff's allegations of disabling functional limitations.

Nonetheless, the Ninth Circuit has noted that, with respect to mental health conditions, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment[,]" as "[c]ycles of improvement and debilitating symptoms are a common occurrence[.]"  *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *cf. Holohan v. Massinari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").  The record here includes references to both a normal mood and affect and to increased mental health symptoms.  Simply pointing to the instances of noted normal or bright mood do not, without a more thorough discussion, show a contradiction between Plaintiff's testimony and the medical record.  *Garrison*, 759 F.3d at 1017 (ALJ must interpret reports of improvement in relation to mental health issues with an "understanding of the patient's overall well-being and the nature of her symptoms" and also "with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace.").

Additionally, while an ALJ may consider objective medical evidence in determining a claimant's credibility regarding subjective symptom testimony, the ALJ may not reject such testimony solely because it is unsubstantiated by the objective medical evidence. 20 C.F.R. §§ 404.1529(c), 416.929(c); *Rollins v. Massanari*, 261 F.3d 853, 856(9th Cir. 2001) ("Once a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain.") (internal quotation marks and brackets omitted) .

Here, none of the reasons offered by the ALJ and discussed above support the ALJ's negative credibility determination. The only remaining reason offered by the ALJ is that Plaintiff declined to follow medical advice when she was advised to stop drinking caffeine before 3:00 p.m. and to stop playing vide games one hour before bed. Tr. 22 (citing 13F/5). Although the ALJ correctly found that these recommendations were made to Plaintiff and she failed to follow them, they relate to her complaints of insomnia, not to many of her other more serious symptoms such as her inability to leave her home. The recommended treatment is also different in kind from, for example, failing to take a prescribed medication, failing to follow a recommended course of physical therapy, or failing to have recommended surgery. Given the entirety of the record, this reason is weak and does not rise to a "clear and convincing" reason. *See Burrell v. Colvin*, 775 F.3d 1133, 1139-40 (9th Cir. 2014) (while ALJ's interpretation of record as suggesting that the claimant was exaggerating her symptoms in order to miss work that she disliked was supportable, court held that "this one weak reason is insufficient to meet the 'specific, clear and convincing' standard on this record"; "[b]ecause the ALJ"s other reasons . . . are not supported by substantial evidence, and because this reason is weak on this record, we

conclude that the ALJ erred in discrediting Claimant's testimony");

Because none of the reasons given by the ALJ for rejecting Plaintiff's credibility are supported by substantial evidence in the record or are clear and convincing, the ALJ erred in rejecting Plaintiff's subjective limitations testimony.

II. Redway Opinion

As indicated above, Plaintiff's treating therapist was Charlotte Redway, a licensed clinical social worker. Plaintiff saw her eight times beginning November 2015 through mid-December 2016. Tr. 501-08. Redway completed a narrative form indicating that the nature of treatment was talk therapy and that Plaintiff had severe anxiety, PTSD, gender dysphoria, and bipolar disorder. Tr. 501-02. She opined that Plaintiff could not work with the public or closely with coworkers and would be unable to respond appropriately to coworkers due to her PTSD. Tr. 502. She also wrote that Plaintiff would be unable to be present full time, eight hours per day, without accommodations or several missed days a month because her PTSD, anxiety, bipolar and gender dysphoria made it impossible for her to work regular hours. *Id.*

Redway also completed a mental residual functional capacity (MRFC) assessment. Tr. 504-07. Of relevance here, Redway assessed Plaintiff as being markedly limited in several abilities: (1) the ability to maintain attention and concentration for extended periods, such as the two-hour periods between starting work and first break, first break and lunch, lunch and second break, and second break until the end of the eight-hour work day; (2) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) the ability to sustain an ordinary routine without special supervision; (4) the ability to work in coordination with or proximity to others without being distracted by them; (5)

the ability to make simple work-related decisions; (6) the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) the ability to interact appropriately with the general public; (8) the ability to ask simple questions or request assistance; (9) the ability to accept instructions and to respond appropriately to criticism from supervisors; (10) the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and (11) the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Tr. 505-06.  She also found that Plaintiff would be moderately limited in the abilities to remember locations and work-like procedures, to understand and remember detailed instructions, and to carry out detailed instructions.  Tr. 505.

The ALJ gave little weight to Redway's assessments because, in the ALJ's opinion, eight treatment sessions was "relatively little contact" with Plaintiff; her report was unaccompanied by her treatment records; and her opinion was not supported by other evidence in the record indicating that Plaintiff socialized with her partner and friends, shopped for groceries, used public transportation, and attended appointments.  Tr. 24.

Plaintiff argues that the reasons given by the ALJ are not germane to Redway's opinions. Defendant contends that the ALJ properly considered Redway to be an "other source." Defendant argues that the ALJ's assessment of the frequency of Redway's treatment sessions as well as his determination that Redway's opinions are contradicted by Plaintiff's functioning are supported in

the record and are reasons germane to her testimony.[5]

Under the applicable regulations, a licensed clinical social worker is not an acceptable medical source. 20 C.F.R. §§ 404.1513(a), 416.913(a). Instead, this type of practitioner is an "other" medical source whose opinion is relevant to determining the severity of the claimant's impairments and how they affect the claimant's ability to function. 20 C.F.R. §§ 404.1514(d), 416.913(d). To reject the testimony of other medical sources, the ALJ must provide reasons germane to the witness. *Molina*, 674 F.3d at 1111.

The ALJ's reasons are not supported by the record. Plaintiff regularly saw Redway beginning in November 2015. While eight sessions over the course of one year could not reasonably be characterized as "frequent," the number of those sessions is not reasonably characterized as "relatively little contact." There is no indication in the record that Redway's contact with Plaintiff was such that she was unable to form an opinion or properly assess Plaintiff's condition. Further, as discussed above, the ALJ erred by relying on what he considered to be infrequent mental health treatment without discussing Plaintiff's ability to pay for such treatment.

As to her treatment records, the ALJ is correct that those records were not submitted with Redway's narrative and MRFC. Tr. 501-08. In this case, however, Redway explained their

---

[5] Defendant also argues that the ALJ rejected Redway's opinions because Redway attributed limitations to bipolar disorder and PTSD which are not supported in the record as actual diagnoses. Def.'s Brief 5. But, the ALJ did not give this as a reason for rejecting Redway's opinions. Tr. 24. The ALJ very expressly and specifically detailed his reasons for giving Redway's opinion little weight and the fact that Redway's diagnoses included PTSD and bipolar disorder was not one of those reasons. *Id.* Moreover, in support of her opinions, Redway also cited diagnoses of anxiety and gender dysphoria, which the ALJ accepted as severe medical impairments. Therefore, I do not consider Defendant's argument further.

absence.  Tr. 508.  She said that she was completing a memo about Plaintiff on December 15, 2016, during a snowstorm.  *Id.*  She stated her intention of mailing the information to Plaintiff's attorney "in place of chart notes that are currently inaccessible in my office due to road conditions."  *Id.*  This memo was written only six days before Plaintiff's hearing, but it was part of the record at that time.  Tr. 36 (noting that Exhibit 15F was in the record).  Thus, at the time of the hearing, the ALJ was on notice that chart notes existed and were omitted only because of inclement weather.

Plaintiff argues that under these facts, the ALJ should have obtained those records instead of relying on their absence to reject Redway's opinion.  I agree.  The ALJ in a social security case has an independent "duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (internal quotation marks omitted).  This duty extends to the represented as well as to the unrepresented claimant.  *Id.* The ALJ may discharge this duty in several ways, including subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record.  *Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998); *Smolen*, 80 F.3d at 1288.  Because the ALJ was on notice that the treatment records existed and were omitted only because they were inaccessible immediately before the hearing, the ALJ was obligated to obtain them to properly evaluate the weight to be attributed to Redway's opinion.  The ALJ erred by not doing so.

Finally, for the reasons previously explained, that ALJ's reliance on Plaintiff's activities as being inconsistent with Redway's opinions is not supported in the record.  The ALJ noted Plaintiff's socializing with her partner and friends, grocery shopping, use of public transportation,

and ability to attend appointments as undermining Redway's functional assessments. But, some of those activities occurred before the alleged onset date. The record shows that others were accomplished only when she was accompanied by her partner. And to the extent Plaintiff did them alone, the record shows that these occurred infrequently. Additionally, Redway assessed Plaintiff as markedly limited in numerous activities and the ALJ fails to explain the relationship between these activities and any specific limitation. Thus, the opinion fails to sufficiently specify why a particular activity is inconsistent with a particular limitation.

The ALJ failed to offer reasons germane to Redway's opinion in support of giving that opinion "little weight."

III. Lay Witness Testimony

Plaintiff's partner Breqa D. Tagwerker completed a third-party report which stated that "more often then [sic] not, Claire is unable to leave the house." Tr. 249. Tagwerker noted that depending on the severity of Plaintiff's dysphoria, she goes back to sleep after being up or, on good days, she will tinker with her computer. Tr. 250. She has nightmares and sometimes insomnia, or she sleeps for days. *Id.* Tagwerker described Plaintiff's obsessive behaviors as including obsessively shaving, taking one half-hour to load the dishwasher because she wants to make sure water will hit every dish, and taking three times longer than the average person when shopping because she inspects every item for damages and compares prices to volume on similar items. Tr. 250-52. She obsesses over money, even though she has none. Tr. 252.

Tagwerker described Plaintiff's hobbies as computer hardware and video games. Tr. 253. Tagwerker explained that Plaintiff rarely goes outside and usually only with Tagwerker. Tr. 251. She said that Plaintiff had been out of the house only two times in the past two months without

Tagwerker.  *Id.*  She indicated that Plaintiff "<u>can</u> go out alone," but it was safer when they were together.  Tr. 252.  She also said that Plaintiff was not mentally able to deal with people.  *Id.*  Together, they go to Goodwill and Value Village for clothes and to Walmart for groceries and supplies.  *Id.*  Tagwerker described Plaintiff as having a very limited attention span and noted her negative history with authority figures such as teachers and bosses.  Tr. 254.  According to Tagwerker, Plaintiff responds to stress by withdrawing.  Tr. 255 ("She sleeps, hides in her room. If it's really bad, she won't even talk to me.").

The ALJ considered the information provided by Tagwerker but gave it little weight.  Tr. 25.  The ALJ found that Tagwerker's report was internally inconsistent because Tagwerker said that "claimant is unable to leave the house" but also reported that claimant shops with Tagwerker for clothes and groceries.  The ALJ appears to have misread Tagwerker's statements.  Tagwerker actually said that "*more often th[a]n not*, Claire is unable to leave the house."  Tr. 249 (emphasis added).  Contrary to the ALJ's finding, Tagwerker did not report that Plaintiff never leaves the house.  *See also* Tr. 251 (stating that Plaintiff rarely leaves the house and usually only with Tagwerker); Tr. 252 (explaining that Plaintiff can go out alone but she is unable to mentally deal with people).  Tagwerker's report is not internally inconsistent.

The ALJ also found that Tagwerker's report conflicted with the evidence that Plaintiff can leave the house to attend appointments and go to court to have her name changed.  For reasons previously explained, this finding is not supported by record.

The ALJ accepted other parts of Tagwerker's report, giving "some weight" to Tagwerker's statements that Plaintiff avoids interactions with others and has problems with memory, completing tasks, concentration, understanding, following instructions, and getting along with

others, and that she has difficulty handling stress and changes in routine. Tr. 25. But, the ALJ indicated, Tagwerker's testimony did not show that Plaintiff was completely disabled because she can still perform personal care independently, prepare simple meals, load the dishwasher, shop for food and clothes in stores and by computer, and work with computer hardware and play video games. *Id.* The ALJ explained that the limitations reported by Tagwerker were generally accommodated by the ALJ's RFC. *Id.*

I agree with Plaintiff that the ALJ's reasoning is flawed. An ability to perform personal care, prepare simple meals, and load the dishwasher do not disprove the disabling nature of Plaintiff's impairments. The record shows that Plaintiff shopped for food and clothes, at least after the alleged onset date, only with Tagwerker and rarely left the home by herself. The ALJ's accommodation of no interaction with the public and occasional interactions with co-workers or supervisors, does little to address her inability to regularly leave her home.

The ALJ misread Tagwerker's report and therefore, his rejection of Tagwerker's testimony regarding Plaintiff's ability to leave their home is not supported in the record. The other reasons given by the ALJ for limiting the weight given to Tagwerker's report are unsupportable. Thus, the ALJ erred in his treatment of Tagwerker's lay opinion testimony.

IV. Remand

In social security cases, remands may be for additional proceedings or for an award of benefits. *E.g., Garrison*, 759 F.3d at 1019 (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded[,]" but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks

omitted).

To determine which type of remand is appropriate, the Ninth Circuit uses a three-part test. *Id.* at 1020; *see also Treichler v. Comm'r*, 775 F.3d 1090, 1100 (2014) ("credit-as-true" rule has three steps). First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020. Second, the record must be fully developed and further administrative proceedings would serve no useful purpose. *Id.* Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled. *Id.* To remand for an award of benefits, each part must be satisfied. *Id.; see also Treichler*, 775 F.3d at 1101 (when all three elements are met, "a case raises the 'rare circumstances' that allow us to exercise our discretion to depart from the ordinary remand rule" of remanding to the agency).

Remand for additional proceedings is appropriate in this case. The ALJ failed to provide sufficient reasons for rejecting Plaintiff's testimony, Redway's opinion, and Tagwerker's report. But, the record here is far from fully developed. First, Redway's treatment notes may provide more relevant information as to the nature of Plaintiff's condition in the thirteen months leading up to the hearing. Second, the medical evidence, as detailed above, shows that Plaintiff's mental health symptoms waxed and waned during the relevant period. Furthermore, the record suggests that her symptoms may have escalated during 2015. A closer examination of the record will allow the proper assessment of when Plaintiff's symptoms reached a disabling level, if they did at all. Third, remand for additional proceedings will allow the ALJ to fully develop the record regarding Plaintiff's financial condition and ability to pay for counseling. As a result, further administrative proceedings, including obtaining Redway's treatment notes, will be useful.

Therefore, the three-part test required to remand for benefits is unmet.

CONCLUSION

The Commissioner's decision is reversed and remanded for additional proceedings.

IT IS SO ORDERED.

Dated this ___28___ day of _____May_____, 2019

_____
Marco A. Hernandez
United States District Judge